Kass Harstad (Bar No. 11012)
Cameron Platt (Bar No. 16548)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
(t) 801.359.4169
(f) 801.359.4313
Email: kass@utahjobjustice.com
　　　　Cameron@utahjobjustice.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **XAVIER BRADLEY,**<br><br>　　　Plaintiff,<br><br>vs.<br><br>**WORTHINGTON INDUSTRIES, INC.,** an Ohio corporation, and **DHYBRID SYSTEMS, LLC**, an Ohio Limited Liability Company,<br><br>　　　Defendants. | **COMPLAINT**<br>**(JURY DEMANDED)**<br><br><br>Civil No. 2:18-cv-00486-PMW<br><br>Judge Paul M. Warner |

Plaintiff Xavier Bradley ("Plaintiff" or "Mr. Bradley"), by and through his attorneys, hereby complains against Defendants Worthington Industries, Inc. ("Worthington" or "Worthington Industries") and dHybrid Systems, LLC ("dHybrid Systems") (collectively, "Defendants") as follows:

## I.　　NATURE OF THE CLAIMS

1.　　This suit is brought by Plaintiff under the Civil Rights Act of 1866, as amended and codified at 42 U.S.C. § 1981.

2. Plaintiff, an African-American male, was employed by Defendants and suffered harassment based on race and retaliation. Specifically, Defendants subjected Mr. Bradley to derogatory racial slurs, comments, and threats. Mr. Bradley reported the discrimination he experienced to Defendants, and Defendants failed to take sufficient corrective action and retaliated against Mr. Bradley for such reports.

3. Plaintiff seeks economic damages, compensatory damages, interest and attorneys' fees and costs.

## II. PARTIES

4. Mr. Bradley resides in the State of Utah, Salt Lake County, and was employed by Defendants at all times relevant to the allegations in this Complaint.

5. Defendant Worthington Industries, Inc., is a corporation formed under the laws of the State of Ohio with its principal place of business in Ohio.

6. Defendant dHybrid Systems, LLC, is a limited liability company formed under the laws of the State of Ohio. Its principal place of business is in Salt Lake City, and it is registered to do business in the State of Utah.

7. Upon information and belief, Worthington Industries and dHybrid Systems are a single, integrated employer. Thus, it is alleged that liability also flows to both dHybrid Systems and Worthington Industries as a single and/or joint employer. For example, and upon information and belief:

    a. In approximately October 2014, Worthington acquired a majority (almost 80%) ownership interest in dHybrid Systems. Since that time, both entities have had common management, as well as common ownership and financial control.

    b. They both share the same physical address as their principal place of

business, and they have interrelations of operations.

   c.   They share the same corporate Human Resources Department, and hence have common control of labor relations.

### III.   JURISDICTION AND VENUE

8. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

9. Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b), because the majority of the alleged unlawful acts were committed within the jurisdiction of this Court.

### IV.   GENERAL ALLEGATIONS

10. Worthington Industries is a diversified metals manufacturing company, focusing on manufactured metal products such as pressure cylinders for compressed natural gas ("CNG").

11. dHybrid Systems engineers and manufactures CNG fuel systems for large trucks.

12. In approximately October 2014, Worthington acquired a majority ownership interest in dHybrid Systems. Prior to the acquisition, dHybrid was located and did business in St. George, Utah. After the acquisition, Defendants moved dHybrid's operations and most of its employees from St. George to Salt Lake City, and Defendants also hired new employees in Salt Lake City.

13. As part of the companies' consolidation, Defendants hired Mr. Bradley in March 2015, as an assembler fabricating CNG cylinders in its Utah and Ohio facilities. As an assembler, Mr. Bradley job duties included welding and assembling cylinders, transporting and moving cylinders and doing quality assurance.

14. Mr. Bradley is African-American.

15. Shortly after Mr. Bradley started, he was subjected to racial harassment by his coworkers William Mason, Ray Johnson and Challen (last name unknown).

16. Mr. Mason, the area lead when the regular manager was absent, warned Mr. Bradley on his first day at work that he makes racial comments in the workplace. He also told Mr. Bradley that he had used the word "n***er" since he was young, and that he "didn't see anything wrong with it."

17. Mr. Mason repeatedly used the word "n***er" at work, told Mr. Bradley he was "n***er lipping" when Mr. Bradley drank from a straw, and called Mr. Bradley and another employee "whiggers" (an epithet created by combining the words "white" and "n***er") because of their choice of music.

18. In addition, when Mr. Mason learned that Mr. Bradley does not like chocolate he exclaimed, "how can a black man not like chocolate, when they're practically made out of it?"

19. In November 2015, Mr. Mason also said to a truck driver "n***ers are taking over the world" when Mr. Bradley was allowed to use a forklift (instead of a pallet jack) to unload a truck.

20. Challen said equally offensive things to and about Mr. Bradley. For example, Challen announced to Mr. Bradley that he (Challen) had a right to comment on differences he noticed between races, and he took every opportunity to point them out during the workday.

21. For example, Challen told Mr. Bradley that black people cannot swim, warned Mr. Bradley that he would turn purple out in the sun, and characterized Mr. Bradley's hair as "nappy."

22. Challen also referred to Mr. Bradley as Kunte Kinte and described African Americans as a "poor society that would never amount to much."

23. Mr. Mason and Challen subjected Mr. Bradley to these kinds of epithets and comments at least two to three days a week.

24. In June and December, 2015, Mr. Bradley reported the harassment and hostile work environment to his manager, Cody Bunker. Mr. Bunker did nothing to stop the harassment and hostile work environment, and upon information and belief, he did not notify anyone else at Worthington or dHybrid about Mr. Bradley's reports of harassment and hostile work environment.

25. In June and December, 2015, Mr. Bradley also reported the harassment and hostile work environment to Kara Albright, the designated contact between the Salt Lake City and Ohio operations who was supposed to be handling human resources functions in Salt Lake City. Mr. Bradley also asked Ms. Albright how to contact Defendants' corporate Human Resources ("H.R.") Department in Ohio.

26. In response to Mr. Bradley's report of harassment and hostile work environment, Ms. Albright told Mr. Bradley that he had to "give Challen and Will [Mason] time to adjust because this [*e.g.*, working with a black person] is new to them."

27. Ms. Albright did not tell Mr. Bradley how to contact Defendants' corporate H.R. Department in Ohio, and upon information belief, she did not report Mr. Bradley's report of harassment and a hostile work environment to anyone in the corporate H.R. Department.

28. Defendants took no action to investigate Mr. Bradley's report, to stop the harassment from occurring in the future, or to correct the effects of the harassment on Mr. Bradley and his workplace.

29. As a result of Defendants' inaction, the harassment and hostile work environment got worse. Indeed, in December 2015 or January 2016, Ray Johnson commented to Mr. Bradley, "I didn't know that black people have families" and "I thought they all lived at the dump."

30. At around this same time period, Challen told Mr. Bradley that he would "stuff his head" and mount it "with spears behind it to make [Mr. Bradley] and Africans proud." Challen also made veiled threats to Mr. Bradley about "shooting up the shop," and all of these comments caused Mr. Bradley to fear for his physical safety.

31. Unable to endure the dehumanizing treatment any longer, Mr. Bradley again reported the harassment and hostile work environment to Ms. Albright in early January 2016, and he suffered retaliation almost immediately thereafter.

32. Specifically, when Mr. Mason and Mr. Johnson learned of Mr. Bradley's report of harassment, they stopped speaking to him and refused to interact with Mr. Bradley even for work-related reasons.

33. Furthermore, when Cody Bunker (the supervisor of Mr. Bradley, Mr. Mason, Mr. Johnson and Challen) gave instructions to other employees, they refused to share this information with Mr. Bradley.

34. Mr. Bunker thereafter moved Mr. Bradley to a different area of the facility so that Mr. Mason and Mr. Johnson would not have to speak to Mr. Bradley.

35. Additionally, Mr. Bunker took away most of Mr. Bradley's work duties, and instead gave Mr. Bradley menial tasks to do, such as cleaning, sweeping the shop and putting away tools. Indeed, after January 2016, approximately 80% of Mr. Bradley's work day consisted of engaging in these menial tasks.

36. Mr. Bradley reported the retaliation (*e.g.*, being moved to a different part of the facility and having his work duties reduced to menial tasks like cleaning) to Ms. Albright, yet Defendants took no actions to prevent, stop, or correct the discrimination or retaliation.

37. Instead, on February 16, 2016, Mr. Bunker called Mr. Bradley into his office and terminated his employment, supposedly for poor performance.

38. Mr. Bradley suffered significant financial harm from Defendants' misconduct, and he has been unemployed or underemployed since his termination.

39. At the time of his termination, Mr. Bradley had an open workers' compensation claim against Worthington Industries.

40. Shortly after his termination, Mr. Bradley hired the law firm of Strindberg & Scholnick, LLC ("Strindberg & Scholnick") to represent him in his discrimination claims (but not his workers' compensation claim) against Defendants.

41. On June 16, 2016, Mr. Bradley filed a Charge of Discrimination against Worthington Industries with the Equal Employment Opportunity Commission ("EEOC"). On that same day, Strindberg & Scholnick notified Worthington Industries that they represented Mr. Bradley in his employment discrimination claims.

42. While Mr. Bradley's race discrimination claims were pending at the EEOC, Worthington Industries negotiated a settlement agreement with Mr. Bradley on his workers' compensation claim, wherein Worthington agreed to pay Mr. Bradley $20,000 to release his workers' compensation claim.

43. Although Mr. Bradley was purporting to settle only his workers' compensation claim (and not his employment discrimination claims), in October 2016, Worthington sent Mr. Bradley two settlement agreements:

   a. One agreement releasing Mr. Bradley's workers' compensation claim in exchange for $20,000 (the "Workers' Compensation Release"); and

b. A second agreement releasing any claims connected with his "prior employment with Worthington Industries . . . and/or the manner of, reasons for, or circumstances surrounding [his] termination" therefrom, in exchange for $100 (the "Purported Employment Release").

44. Worthington did not send either agreement to Strindberg & Scholnick.

45. Mr. Bradley executed both agreements on October 25, 2016

46. On October 27, 2016, the parties submitted the Workers' Compensation Release (but not the Purported Employment Release) to the Utah Labor Commission for approval.

47. Upon information and belief, Worthington submitted the Purported Employment Release to the EEOC in late 2016, indicating to the EEOC that the parties had resolved Mr. Bradley's employment discrimination claims. Worthington did not copy Strindberg & Scholnick on this communication, despite knowing that the firm represented Mr. Bradley with respect to his employment claims and specifically his Charge pending with the EEOC.

48. In early November 2016, Worthington Industries tendered to Mr. Bradley the $20,000 consideration associated with the Workers Compensation Release. Worthington Industries failed to tender the $100 consideration associated with the Purported Employment Release.

49. In mid-March, 2017, Strindberg & Scholnick received an Acknowledgment of Settlement from the EEOC, wherein the EEOC indicated that it would discontinue its investigation into Mr. Bradley's discrimination claims, on the basis that Worthington Industries and Mr. Bradley had supposedly reached a settlement agreement resolving such claims. This was the first that Strindberg & Scholnick learned of the purported settlement.

50. Upon consultation with Mr. Bradley, Strindberg & Scholnick learned that Worthington Industries had never paid Mr. Bradley the $100 consideration associated with the Purported Employment Release. On March 29, 2017, Mr. Bradley rescinded the Purported Employment Release. . *See Tebbs, Smith & Assocs. v. Brooks*, 735 P.2d 1305, 1307 (Utah 1986) ("An agreement of compromise and settlement in a legal dispute constitutes an executory accord which allows the party alleging breach thereof the option of seeking enforcement of the settlement agreement or of rescinding that settlement agreement and pursuing the underlying claim.")

## FIRST CAUSE OF ACTION
**Hostile Work Environment in Violation of 42 U.S.C. §1981**

51. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

52. Mr. Bradley is African-American.

53. Defendants created a hostile work environment because of Mr. Bradley's race.

54. Defendants' treatment of Mr. Bradley was unwelcome and included, but was not limited to: offensive and derogatory racial slurs and comments; threats of physical harm; moving Mr. Bradley to a different work area; taking job responsibilities away from Mr. Bradley and assigning him menial tasks such as cleaning and sweeping; and manufacturing alleged misconduct regarding Mr. Bradley's work performance.

55. Defendants' discriminatory and harassing treatment towards Mr. Bradley was so severe and/or pervasive that it altered the conditions of his employment and had an adverse impact on his working environment, and ended in the improper termination of his employment.

56. Defendants knew of the harassment and hostile environment perpetrated by its managers and Mr. Bradley's co-workers, and failed to take immediate and appropriate remedial action.

57. Moreover, Defendants are directly liable for the hostile work environment created and maintained by its supervisory level employees.

58. As a result of Defendants' unlawful conduct, Mr. Bradley is entitled to recover damages for lost wages and benefits and prejudgment interest on those amounts. He is also entitled to compensatory and emotional distress damages in an amount to be proven at trial.

59. Additionally, Mr. Bradley is entitled to recover all attorneys' fees and costs expended in prosecuting this action.

60. Defendants' unlawful conduct toward Mr. Bradley was done with reckless disregard for his federally protected rights, and as such, Defendants should be subject to punitive damages as well.

**SECOND CAUSE OF ACTION**
**(Unlawful Retaliation in Violation 42 U.S.C. § 1981)**

61. Plaintiff realleges and incorporates by reference all paragraphs set forth above.

62. Mr. Bradley reported in good faith harassment and a hostile work environment in violation of 42 U.S.C. §1981 in good faith to Defendants on numerous occasions. Specifically, he reported that he was singled out for harassment and a hostile work environment because of his race in June 2015, December 2015, and January 2016.

63. Defendants took multiple adverse actions against Mr. Bradley as a result of his reports of discrimination and harassment. These actions include but are not limited to: failing and refusing to correct and prevent racial harassment and a hostile work environment; moving Mr. Bradley to a different work area; taking job responsibilities away from Mr. Bradley and assigning him menial tasks such as cleaning and sweeping; and terminating his employment.

64. Defendants' adverse actions, including its ultimate termination of Mr. Bradley, is causally linked to his protected activity.

65. Defendants' acts would likely have deterred a person of ordinary firmness from reporting discrimination and harassment.

66. Mr. Bradley suffered harm as a result of Worthington's retaliation. He is entitled to recover all resulting damages including lost pay and benefits, future lost pay and benefits, and emotional distress damages.

67. Mr. Bradley is also entitled to all reasonable attorney's fees and costs incurred in bringing this action.

68. Mr. Bradley is also entitled to punitive damages as Worthington acted maliciously or with reckless disregard to him rights.

## **REQUEST FOR JURY TRIAL**

Plaintiff requests that this matter be tried before a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendant,

a. For Plaintiff's lost wages, compensation, and benefits;

b. For general damages including emotional distress;

c. For punitive damages;

d. For Plaintiff's reasonable attorneys' fees, including expert witness fees as provided by 42 U.S.C. § 1988;

e. For pre-judgment and post-judgment interest at the highest lawful rate;

f. For an offset equal to the additional tax burden for any lost wages/benefits paid or awarded;

g. For injunctive relief; and

h. For costs of court and such other relief as the court deems just and equitable.

DATED this 18th day of June, 2018.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Kass Harstad
Kass Harstad
Cameron Platt
*Attorney for Plaintiff*